UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| **TERRAL RIVER SERVICE, INC. AND NAVIGATORS INSURANCE COMPANY** | **CIVIL NO. 3:19-CV-00406** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **SCF MARINE, INC., AND VESSEL HOLDINGS 7, LLC** | **MAG.JUDGE KAREN L. HAYES** |

**RULING**

Pending before the Court is a Motion to Exclude the Opinion Testimony of Plaintiffs' Purported Expert Bob Bartlett ("Motion to Exclude") [Doc. No. 56] filed by Defendants SCF Marine, Inc. ("SCF"), and Vessel Holdings 7, LLC. Plaintiffs Terral River Service, Inc. ("Terral") and Navigators Insurance Company ("Navigators") oppose the motion.

For the following reasons, Defendants' Motion to Exclude is GRANTED IN PART and DENIED IN PART.

## I. FACTS AND PROCEDURAL HISTORY

This case involves the salvage of a barge while in the custody and control of Terral.

Terral is a Louisiana corporation with its principal place of business in Lake Providence and is engaged in the business of providing fleeting and harbor services on the Mississippi River. Terral is insured by Navigators. Terral owned and operated a facility in Lake Providence Harbor, Louisiana, at or about Lower Mississippi Mile 484 (the "facility"). The facility is located in a narrow finger of water adjoining the main channel.

SCF was the owner and/or operator of SCF 14023 (the "Barge"), which was approximately four years old. SCF and Terral contracted for SCF to provide the Barge.

On or about May 2, 2018, a third-party, C & M Marine, cleaned and inspected the Barge. C & M did not note any fracture. Defendants note that C & M is paid to repair barges, so it had an incentive to find any damage that would need repair.

SCF had the Barge delivered to the facility on May 7, 2018, around mid-day. Terral's harbor boat, the KIM KING, received the Barge from the line boat in the Mississippi River. Terral's crew helped remove the Barge from the tow.

The Barge has a raked bow. The knuckle is the curved piece of metal on the barge corner. The port bow rake knuckle faced out.

On the date of receipt, a Terral employee, Corey Pemberton ("Pemberton"), an experienced deckhand, inspected the Barge and filled out a Barge Inspection Report. Pemberton has inspected more than 1,000 barges in his career. He did not document any damage.

Between May 9 and 10, 2018, the Barge was partially loaded with approximately 1,266 tons of milled rice owned by Kennedy Rice Mill, LLC ("Kennedy"). A Terral fleet vessel monitored the Barge while it was at the facility, checking it regularly (although there was no further "inspection"). At the end of the day on May 10, 2018, the Barge was left alone at the dock.

On May 11, 2018, at approximately 5:45 a.m., the Barge was found partially submerged. The bow was submerged, and the stern was up in the air. The rice that had been loaded was damaged due to the partial submersion, and it was valued at approximately $595,454.20.[1]

Terral undertook salvage operations, and, on May 16, 2018, a salvor was able to raise the Barge. Once the Barge was raised, a fracture was discovered in the Barge's port bow rake

---

[1] Kennedy has been paid $595,454.20 for its damaged cargo and has, in exchange, assigned all rights to Terral and Navigators.

knuckle (the "fracture") that had allowed water into the bow rake compartment, causing the submersion. The fracture measured 12" in length and ¾" in width. There are green paint marks which adjoin the fracture on the outside of the Barge. The Barge itself is gray, not green. Defendants contend there were at least two green barges in the Terral fleets when the SCF barge was at the facility.

Terral claims that the fracture pre-existed delivery of the Barge and estimates it to have been two (2) to four (4) weeks old as of May 11, 2018. They assert that the partial submersion of the Barge was directly and proximately caused by the fault and negligence of SCF. To support these claims, Terral relies in part on the testimony of Bob Bartlett ("Bartlett"), a metallurgical and mechanical engineer. Bartlett opines that the fracture "more likely than not occurred at a pre-existing time before the barge arrived at the Lake Providence area on May 7, 2018." [Doc. No. 56-2, Exh. A].

On September 3, 2020, Defendants filed the instant Motion to Exclude, arguing that Bartlett's opinion testimony fails to satisfy the requirements of Federal Rule of Evidence 702 because he is not qualified to testify as an expert regarding the age of the hull fracture, because his testimony cannot assist the trier of fact, and because his opinion is not the product of reliable principles or methods.   Plaintiffs oppose the motion.

The motion is fully briefed, and the Court is prepared to rule.

## II.   LAW AND ANALYSIS

Under Federal Rule of Evidence 702, an expert opinion on scientific, technical, or specialized knowledge can be admitted only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

3

    (b) the testimony is based on sufficient facts or data;

    (c) the testimony is the product of reliable principles and methods; and

    (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. When faced with expert testimony, the court must determine at the outset if the proponent of the evidence has proven its admissibility by a preponderance of the evidence. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 592 n.10 (1993) (citing FED. R. EVID. 104(a) and *Bourjaily v. U.S.*, 483 U.S. 171, 175-76 (1987)). Courts have considerable discretion in deciding whether to admit or exclude expert testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) ("[W]e conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138-9 (1997).

However, as gatekeeper, the district court is not intended to replace the adversary system: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *United States v. 14.38 Acres of Land, More or Less Situated in Lefore Cty, Miss.,* 80 F.3d 1074, 1078 (5th Cir. 1996) (quoting *Daubert,* 509 U.S. at 596).

In determining whether to allow expert opinion testimony, a court must first decide whether the witness is qualified as an expert by knowledge, skill, experience, training, or education. *See Moore v. Ashland Chemical, Inc.,* 126 F.3d 679, 684 (5th Cir. 1997). A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified

to testify in a particular field or on a particular subject. *Wilson v. Woods,* 163 F.3d 935 (5th Cir. 1999).

If a witness is qualified to testify, the court must then determine whether the proffered testimony is both relevant and reliable. Reliability and relevance, under Rule 702, are the hallmarks of admissible expert testimony. *Daubert*, 509 U.S. at 589; *In re MBS Mgmt. Servs., Inc.*, 690 F.3d 352, 357 (5th Cir. 2012). In making its reliability determination, the court must assess whether the "reasoning or methodology underlying the testimony is scientifically valid." *Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999). However, the focus of reliability "must be solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 595.

Relevance includes not only the general requirement contained in Rule 401 that the testimony tend to make the existence of any fact more probable or less probable, but also the prerequisite that the expert testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702; *Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.") (quoting 3 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶ 702[02], p. 702-18 (1988)). In assessing relevance, courts "must determine whether that reasoning or methodology can be properly applied to the facts in issue." *Id.* (citing *Daubert*, 509 U.S. at 592-93).

Ultimately, "[t]he district court's responsibility is 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 247 (5th Cir. 2002) (quoting *Kumho Tire Co.*, 526

U.S. at 152).

In order to mitigate its damages related to the sinking and the Barge being out of service, SCF repaired the hull fracture in late June and early July of 2018. Bartlett, an engineer, admitted in his April 3, 2020 Report (the "Report") that he was unable to obtain "conclusive evidence of [his] proposed theories" because the hull fracture no longer existed. [Doc. No. 56-2, April 3, 2020 Bartlett Report, p. 6]. Had he been retained when the hull fracture still existed, Bartlett explained that he would have been able to conduct certain scientific testing of the fracture, including "fractographic evaluation of the fracture" and testing to determine the age of the fracture using "corrosion coupons." *Id*. Bartlett testified at length in his deposition concerning how he has evaluated barge fractures previously. [Doc. No. 56-3, Bartlett Depo., pp. 23-31]. Bartlett described how he has employed various means of physically measuring and testing the fracture, the metal of the barge, and the surrounding corrosion. *Id*. However, because Terral did not employ Bartlett to evaluate the barge after it was raised and in their custody and control, and, because SCF repaired the damage in June and July of 2018, Bartlett was unable to conduct any physical inspection or testing of the hull fracture in this case.

Without the fracture to examine, measure, and test, Bartlett instead interviewed a limited number of fact witnesses, reviewed some documents gathered in written discovery, looked at photographs of the hull fracture, and read summaries of deposition transcripts that his colleagues prepared. Although he does not claim to be able to determine the age of the fracture from these sources, Bartlett does express several opinions in his report related to the ultimate question of where and when the hull fracture originated:

> 1. "The TRS loading facility is located in a finger of water connected to the Mississippi River which was protected from the current in the

> Mississippi River. As a result, it is inherently less hazardous and, therefore, less likely for an allision or collision to occur than a berth exposed to the Mississippi River."
>
> 2. The hull fracture "more likely than not occurred at a pre-existing time before the barge arrived to the Lake Providence area on May 7, 2018."
>
> 3. "Considering the slack water in the Lake at the TRS facility and the lack of maneuvering required of the barge in order to bring it in and ultimately bring it to the Port Dock, the puncture and fracture would not be expected to have occurred while the barge was at the TRS Lake Providence facility."

[Doc. No. 56-2, pp. 5-7]

At his deposition, Bartlett elaborated on these opinions and testified that he does not have an opinion as to the actual age of the hull fracture, other than that, "through the process of elimination," he believes the fracture predates Terral's custody and control because the fracture "doesn't appear to have occurred while it was in TRS's custody. . . ." [Doc. No. 56-3, p. 145]. This "process of elimination" is based on Bartlett's impression that there was no river current at Terral's facility (what he refers to as the "slack water in the lake") and his opinion as to the "lack of maneuvering required of the barge." [*Id*., p. 145]. Bartlett testified that his impression that the Terral facility is located in water with "almost no current" is derived "partly by inference and partly by conversation with the people at Terral." [*Id*., p. 98]. Although Bartlett acknowledges that it is possible to take a measurement of the current, he admits that such a measurement was not done to support his opinion. [*Id*., pp. 99-100]. Similarly, although Bartlett opines that Terral's facility is "inherently less hazardous" than a berth exposed to the main channel of the Mississippi, that assumption is based on no data, no quantitative study, and no facts other than Bartlett's allegation that there is no current at the Terral facility. [Id., pp. 104-114]. Bartlett

7

agrees he is not an expert on inland river navigation and testified that he has no experience piloting vessels or fleeting barges. [Id. at 104].

In this case, Defendants move to exclude Bartlett on three bases: (1) he is not qualified to testify as an expert regarding the age of the hull fracture; (2) his testimony cannot assist the trier of fact; and, (3) his opinion is not the product of reliable principles or methods. The Court considers each in turn.

### A. Qualifications to Testify as Expert

First, Defendants contend that Bartlett's proffered opinions concern or are based on his impressions of navigation conditions and hazards at Terral's facility; yet Bartlett is not qualified to offer such opinion testimony. While they acknowledge that Bartlett may be qualified as an expert in engineering or other disciplines, they contend he has no qualifying knowledge, training, or experience concerning the effects of river currents on the piloting of a towboat or on the hazards of mooring barges at different locations on the Mississippi River. Citing *Davis v. Duran*, 277 F.R.D. 362 (N.D. Ill. 2011), Defendants contend that credentials in one field do not qualify a witness to testify as an expert in every field. *See id*. at 368 ("Stephen Hawking would be a stunning witness in a case involving theoretical physics but would never see the light of day in an accounting malpractice case.") Defendants conclude that, because Bartlett's ultimate conclusion – that the hull fracture more likely than not occurred before the Barge was delivered to Terral – is based on the opinions he formed on these navigational and fleeting topics, his ultimate conclusion must be excluded as well.

Terral responds that Bartlett is a metallurgical and mechanical engineer who is qualified to testify on the opinions contained in the Report and expressed in his depositions. Bartlett relied

on several areas of evidence, including testimony, survey reports, photographs, fleet diagrams, and SCF's discovery responses, among other materials, to conclude that more likely than not, the subject fracture in the barge pre-dated its arrival at the Terral facility. Terral contends that, even though Bartlett is admittedly not an expert on river currents or piloting of a tow boat, he is able to rely on the statements of the parties' witnesses as well as his own experience as a marine engineer to testify that piloting a barge in a lake with no current is less hazardous than piloting a barge in the main channel of the Mississippi River.

First, the Court notes that Bartlett is an experienced metallurgical and mechanical engineer, and no party disputes that he is qualified to testify in that regard. However, as to the disputed opinion, the Court finds that Bartlett's opinion strays far from his claimed area of expertise. Bartlett has no qualifying knowledge, training, or experience concerning the effects of river currents on the piloting of a towboat or on the hazards of mooring barges at different locations on the Mississippi River. The Court finds that whatever skill or expertise he may have as a metallurgist or engineer does not provide the basis for his ultimate conclusion in this case. Accordingly, to the extent Bartlett's ultimate conclusion, that the hull fracture more likely than not occurred before the Barge was delivered to Terral, is based on the opinions he formed on the navigational and fleeting topics, topics on which he admittedly has no expertise, his ultimate conclusion must be excluded.

**B.  Assist the Trier of Fact**

Defendants further challenge Bartlett's testimony on the age of the hull fracture on the basis that it does not assist the trier of fact but is instead merely a gratuitous interpretation of the factual record.   Additionally, they contend the opinion itself does not aid the trier of fact in

9

deciding this case.

The central issue is whether the barge had a fracture before it was accepted by Terral, not whether piloting in the main channel is more hazardous than piloting in an inlet that allegedly lacks a current. Defendants assert that this very general proposition about navigation, which Plaintiffs propose to have Mr. Bartlett offer despite his lack of navigation expertise, tells this Court nothing that would help decide the fundamental issue of whether the fracture was present when Terral accepted the barge.

Terral argues that Bartlett's opinions will assist the Court because "[b]ased on his conversations with witnesses and review of deposition transcripts, fleet diagrams, and logs, he has not found any evidence that the fracture to the barge could have occurred while at the Terral facility." [Doc. No. 72, p. 7].

The Court finds that Bartlett's opinions should be excluded on this basis as well. "While expert testimony may be used to 'assist the trier of fact to understand the evidence or to determine a fact in issue,' Fed. R. Evid. 702, an expert witness may not usurp the jury's function to weigh evidence and make credibility determinations." *United States v. Farrell*, 563 F.3d 364, 377 (8th Cir. 2009). "Although an expert witness may provide opinions regarding factual issues and rely on factual assumptions in forming those opinions, the opinion must add something and not merely be a gratuitous interpretation the factual record." *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 834 (N.D. Ill. 2013) (citations and quotation marks omitted); *see also Alcala v. Emhart*, 2006 WL 5112759 (N.D. Ill. Apr. 25, 2006). "'If an expert's testimony does nothing more than attorneys can do in final arguments, it is not admissible because it is providing not knowledge, but mere opinion and advocacy.'" *Cage*, 979 F. Supp. 2d. at 835 (quoting David H.

Kaye, David E. Bernstein and Jennifer L. Mnookin, *The New Wigmore: A Treatise on Evidence: Expert Evidence*, § 2.1.2).

Here, Bartlett did not perform any testing, conduct any experiments, or interpret any specialized literature. Instead, he merely developed an interpretation of the facts in the record. It is the province of the Court, not an expert witness, to decide what the evidence shows. Although an expert can assist the Court by offering a reliable opinion based upon specialized knowledge where appropriate, it is not the role of an expert witness to substitute his judgment for that of the Court in reviewing the evidence and determining what, in fact, happened. Because Bartlett's methodology does not add anything to the factual record or assist the trier of fact, but instead usurps the role of the trier of fact, his testimony should be excluded under Rule 702.

### C. Use of Reliable Principles or Methods

Defendants also challenge Bartlett's testimony as to the age of the hull fracture on the basis that he did not use reliable principles or methods. In *Daubert*, the Supreme Court identified five factors that may be pertinent in assessing reliability: (1) the theory or technique in question can be and has been tested; (2) it has been subjected to peer review and publication; (3) it has a known or potential error rate; (4) the existence and maintenance of standards controlling its operation; and (5) whether it has attracted widespread acceptance within a relevant scientific community. 509 U.S. at 593–94.

Defendants argue that Bartlett's report and testimony reflect an absence of methodology. There is no method, technique, or principles to be tested pursuant to the *Daubert* standards in evaluating Bartlett's proffered testimony. Bartlett did not perform any testing or qualitative study in order to reach his opinion that the Terral facility was "inherently less hazardous" – the opinion

11

underlying his ultimate conclusion that the hull fracture more likely than not occurred before Terral took custody of the Barge. Because Bartlett did not employ any kind of methodology or technique in order to reach his ultimate conclusion, Defendants argue that his testimony is unreliable and should be excluded.

Terral responds that the *Daubert* factors are not an exclusive list to determine whether an expert's testimony is admissible under Rule 702. *See Daubert*, 509 U.S. at 593. There is no requirement that an expert consult scientific literature or that their opinions be subject to peer review. *See Pipitone*, 288 F.3d at 247. Terral states that Bartlett relied in part on the witness mark--the mark that is left when two objects make contact, which in this case is the green paint adjacent to the fracture, to form his opinion that contact with a green kevel caused the fracture. [See Doc. No. 72-2, Bartlett Depo., pp. 172-173; see also Doc. No. 72-4, Bartlett Declaration, at ¶9]. He does not believe the fracture could have been caused by a green barge corner because it would not be able to produce the scuff marks in the shape that is seen in Figure 5 to his report. [Doc. No. 72-2, at pp. 173-174; see also figure 5 to Doc. No. 72-5, report of Bartlett Engineering]. Bartlett testified that the concept of using witness marks to evaluate the type of item that caused the mark is something that is widely practiced in metallurgical failure analysis and failure analysis identity. [Doc.No. 72-2, at p. 174]. Either way, according to Terral, whether a kevel or a barge, there is no evidence of any green object coming into contact with the barge at the Terral facility.

The Court finds that, to the extent Defendants object to Bartlett's report and testimony with regard to the witness marks on the basis that he did not use reliable principles or methods, Defendants' motion must be denied. Defendants have not refuted Bartlett's testimony that the use

of witness marks is widely practiced in metallurgical failure analysis and failure analysis identity. Accordingly, to that extent, the motion is DENIED.

### III. CONCLUSION

For the foregoing reasons, Defendants' Motion to Exclude [Doc. No. 56] is GRANTED IN PART and DENIED IN PART. To the extent Bartlett's ultimate conclusion, that the hull fracture more likely than not occurred before the Barge was delivered to Terral, is based on the opinions he formed on the navigational and fleeting topics, topics on which he admittedly has no expertise, the motion is GRANTED, and his ultimate conclusion based on those opinions must be excluded. Additionally, to the extent Bartlett's testimony on the age of the hull fracture is merely a gratuitous interpretation of the factual record which calls for no expertise, the motion is GRANTED, and that testimony is excluded. Finally, to the extent Defendants object to the portions of Bartlett's report and testimony which rely on the witness marks, on the basis that he did not use reliable principles or methods, the motion is DENIED. Defendants did not challenge Bartlett's testimony otherwise; therefore, Plaintiffs may otherwise call Bartlett, and he may also offer testimony as a fact witness and opinion testimony on other matters within his expertise as a metallurgical and mechanical engineer.

MONROE, LOUISIANA, this 28th day of December, 2020.

_____
TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE

13